UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAWAN SMITH,

                    Plaintiff,

v.                                          Civil Case No. 13-14307
                                            Honorable Linda V. Parker

GRAND TRUNK WESTERN
RAILROAD COMPANY,

                    Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING MOTIONS IN LIMINE AS MOOT

In this lawsuit, filed October 10, 2013, Dawan Smith ("Smith") claims that his former employer, Grand Trunk Western Railroad Company ("Grand Trunk"), subjected him to race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII) and Michigan's Elliot Larsen Civil Rights Act ("ELCRA") when it dismissed him in 2011 and 2013.  Smith was reinstated after both dismissals, but was again dismissed in 2014.  He claims that his latest termination also was based on his race and in retaliation for a complaint of discrimination he filed with the Equal Employment Opportunity Commission (EEOC") and this lawsuit.

Presently before the Court is Grand Trunk's motion for summary judgment, filed pursuant to Rule 56 of the Federal Rules of Civil Procedure on March 5, 2015. The motion has been fully briefed. Finding the facts and legal arguments sufficiently presented in the parties' pleadings, the Court dispensed with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f) on April 16, 2015. For the reasons that follow, the Court is granting Grand Trunk's summary judgment motion.

## I.    Summary Judgment Standard

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323. Once the movant meets this burden, the

2

"nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient.  *See Liberty Lobby*, 477 U.S. at 252.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

## II.    Factual and Procedural Background

Grand Trunk is a rail carrier that operates in various states within the United States.  Grand Trunk instructs its employees that safety and a commitment to obey company rules are "the most important elements in performing [their] duties."  (Pl. Dep. Ex. 4, 7; Pl. Dep. at 63-64, 67.)  These rules require employees at all times to *inter alia* ensure that trains are operated safely and in compliance with rules, to act responsibly to prevent accidents, and to promptly report any violations.  (Pl. Dep.

Ex. 5; Pl. Dep. at 63-64.)  Smith received regular training regarding these and other Grand Trunk operating and safety rules.  (Pl. Dep. at 19-22.)

Smith, who is African-American, began working for Grand Trunk on January 5, 1998.  He worked at several train yards in various positions, including Conductor and Brakeman.  The Conductor "works as a member of a two- or three-person crew and performs duties associated with the movement of trains, cars, and engines in rail yards and on the road."  (Pl. Dep. Ex. 3.)  A Conductor also "operates track switches, couples and uncouples cars, applies handbrakes, and mounts and dismounts moving equipment."  (*Id.*)  A Brakeman assists the Conductor in performing his or her duties.  (Pl. Dep. at 54-55.)

During his employment with Grand Trunk, Smith was a member of the United Transportation Union ("Union") and was subject to all of the terms, conditions, rights, and protections of the collective bargaining agreement ("CBA") between the Union and Grand Trunk.  (*Id.* at 55.)  Under the CBA, employees have the right to an investigative hearing before discipline may be issued, unless the employee waives that right.  (*Id.* at 60-61.)  The hearing is conducted by a hearing officer, who determines whether the employee violated the charged infractions. (Golombeski Dep. at 16-19.)  If a violation is found, Grand Trunk's management decides the level of discipline to be assessed.  (*Id.* at 18; Tassin Dep. 2 at 10.) Phillip Tassin, who disciplined Smith with respect to the events at issue in this

4

lawsuit, testified that he assesses discipline based on the severity of the infraction and the employee's past disciplinary history.  (Tassin Dep. 1 at 24-25; Tassin Dep. 2 at 16-17.)  Tassin generally looks at the employee's disciplinary history in the past three years; however, if an employee has numerous incidents, he may look back further.  (Tassin Dep. 2 at 16.)

Smith was disciplined on a number of occasions during the course of his employment, and prior to the incidents at issue in this lawsuit: missing calls for work (1999, 2002, 2006, 2009); failing to inspect a train (1999); failing to perform his duties (1999); causing cars to be sent to the incorrect yard (2000); performing duties of a locomotive engineer without an engineer license (2001); failing to notify the Trainmaster of a broken rail (2003); failing to notify a crew about existing dangerous track conditions (2003); causing delay to a train by failing to provide car pickup information (2003); failing to comply with a rail traffic controller's instructions (2008); leaving a train unattended to grocery shop (2008); allowing a train to leave the yard with cars not assigned to that train (2004); allowing a train to enter an area without authority (2008); and failing to wear required Personal Protective Equipment (2008).  (Pl. Dep. at 215-16, 219-28, 230-43, 246-47; Pl. Dep. Ex. 29-30, 32-38, 40-44, 49-51, 53-54, 59.)  In addition to the above, on August 6, 2009, Smith failed to comply with the Battle Creek Yardmaster's instructions to pick up nineteen railcars in Lansing, Michigan,

5

causing a six-hour train delay.  (Pl. Dep. A at 215-16, 249-50; Pl. Dep. Ex. 29, 63.)
A formal investigation was held, and a hearing officer determined that Smith had
violated company rules.  (*Id*.)  As discipline, Smith was dismissed from service,
effective October 13, 2009.  (*Id*.)

Grand Trunk allowed Smith to return to service on a "leniency basis" on
January 21, 2010.[1]  (Pl. Dep. at 251-53; Pl. Dep. Ex. 65.)  As a condition, Smith
signed a reinstatement agreement in which he was warned that any future incident
of unsatisfactory work or conduct could result in discipline, up to and including
dismissal.  (*Id*.)

On May 25, 2011, Smith was working in Grand Trunk's Joliet, Illinois yard
as a Conductor, with Engineer Rod Holliday (who is African-American) and
Engineer Pilot Justin Gibbs (who is Caucasian).  (Pl. Dep. at 159-60, 197; Spears
Decl. ¶¶ 4-5.)  Utility Brakeman Calvin Posey (who is African-American) also
assisted with certain tasks that evening.  (Pl. Dep. at 161, 197; Posey Dep. at 26;
Pl. Dep. Ex. 22 at GTW 666-670.)  Smith's crew was tasked with shoving (i.e.,
pushing with the engine) cars into two different tracks.  (Pl. Dep. at 170, 183; Pl.
Dep. Ex. 22 at GTW 618, 666-67, 690, 782-83.)  Under United States Operating
Rule ("USOR") 502, employees shoving cars on a track are required to "protect the

---

[1] According to Grand Trunk, "leniency basis" means the employee had no right to
reinstatement under the CBA, but Grand Trunk, for other reasons, decided to grant
the employee another chance.  (Def.'s Br. in Supp. of Summ. J. Mot. at Pg ID 194,
ECF No. 37; *see also* Tassin Decl. ¶ 4.)

6

point," which means ensuring that the moving railcars do not roll past their intended destination.  (Pl. Dep. at 164-66; Pl. Dep. Ex. 22.)  Smith instructed the Engineer (Holliday) to shove cars without ensuring that the point of the train was protected, and the railcars shoved past the end of the track.  (Pl. Dep. at 183-84; Pl. Dep. Ex. 22 at GTW 646-49, 657-59, 661-62, 664, 672-73.)  Smith was the only crew member charged for failing to protect the point, as he was the Conductor and gave the shoving instruction.  (Pl. Dep. at 183-84; Pl. Dep. Ex. 22; Bruns Dep. at 18-19.)

Following an investigative hearing, it was determined that Smith was responsible for the incident.  (Pl. Dep. at 195; Pl. Dep. Ex. 23.)  Tassin decided to terminate Smith based on the severity of the incident and his extensive disciplinary history.  (Tassin Dep. 1 at 54.) The Union requested Smith's reinstatement, which Grand Trunk initially denied.  (Pl. Dep. at 202; Pl. Dep. Exs. 25, 26.)  Grand Trunk subsequently decided to reinstate Smith based on leniency, effective December 1, 2011, subject to a reinstatement agreement.  (Pl. Dep. at 203-06; Pl. Dep. Exs. 26, 27.)  The reinstatement agreement provided that "future leniency will not be forthcoming" and "future incident of unsatisfactory work or conduct may result in disciplinary action, up to and including dismissal."  (Pl. Dep. at 203-04; Pl. Dep. Ex. 27.)

A little over a year later, on January 22, 2013, Smith was working with Conductor Daniel Fettig and Engineer Stephen Manta (who are both Caucasian). The three employees were assigned the task of delivering two railcars to Grand Trunk customer Michigan Paper.  (Pl. Dep. at 107-08; Fettig Dep. at 6-7; Manta Dep. at 6.)  The crew needed to uncouple the railcars (i.e. separate them from the engine), maneuver behind the railcars, and "shove" (or push) them into Michigan Paper.  (Pl. Dep. at 108-10.)

Fettig disembarked the engine cab to uncouple the railcars, while Manta and Smith, who was working as a Brakeman, remained in the engine cab.  (Pl. Dep. at 97, 109-10; Pl. Dep. Ex. 10 at GTW 971-72, 977; Fettig Dep. at 7.)  The cars were uncoupled.  (Fettig Dep. at 7-8.)  The crew then continued to the next switch area, leaving the two railcars unattended.  (Pl. Dep. at 126-28; Manta Dep. at 12-13.)  When the crew subsequently returned to where they had left the railcars, the cars were not there.  (Pl. Dep. at 97, 127-128; Pl. Dep. Ex. 10 at GTW 931-94, 1242-44; Manta Dep. at 12-13.)  They had rolled past a red signal and coupled into the end of another rail carrier's train.  (Pl. Dep. at 97, 127-28; Pl. Dep. Ex. 10 at GTW 931-34, 1242-44.)  Management, in response, removed the entire crew from service pending further investigation, as is done when it appears that the entire crew may be at fault for an incident or accident.  (Pl. Dep. at 97, 142; Pl. Dep. Ex. 10 at GTW 923-25, 1232-34; Tassin Decl. ¶ 8.)

8

At a formal investigation of the entire crew on January 30, 2013, Fettig, Manta, and Smith denied responsibility for the collision of the railcars with the other rail carrier's train. (Pl. Dep. at 97; Pl. Dep. Ex. 10 at GTW 1004-06.) At the hearing, Fettig testified that he applied a handbrake to one of the railcars, but that the crew did not perform a brake (or "push-pull") test to determine the effectiveness of the handbrake, which is required anytime a railcar is left unattended to prevent uncontrolled railcar movement. (Pl. Dep. at 97, 116-17; Pl. Dep. Ex. 10 at GTW 924, 931-34, 944-45, 951-53, 964, 976, 979-80, 1243-44, 1269-70.)

Under USOR 100 and 104, all crew members are responsible for the safe operation of the trains, which includes setting brakes and performing a brake test. (Pl. Dep. at 67-70, 117; Pl. Dep. Ex. 7.) A crew member aware that the test has not been done must ensure that it is, even if that crew member would not otherwise be involved in performing the test. (Pl. Dep. at 117, 124; Tassin Dep. 1 at 57-61, 53.) According to the hearing testimony, Smith would have been able to feel the engine move if the crew had done the brake test and should have known that no brake test had been done. (Hommerding Dep. at 21-22; Tassin Dep. 1 at 64; Pl. Dep. at 113.) Moreover, crew members communicate over the radio during a brake test and those communications can be heard by the entire crew. (Pl. Dep. at 114; Hommerding Dep. at 21-22.) Smith testified that he did not hear Fettig and Manta

9

communicating about the test, and he did not confirm that the test had been performed.  (Pl. Dep. at 122-24.)

Management concluded that the entire crew violated company rules by failing to perform, and ensure the performance of, the push-pull test.  (Tassin Dep. 1 at 49, 57-59, 60-65.)  After reviewing the evidence presented at the hearing, Tassin made the decision to dismiss all three crew members from employment on February 6, 2013.  (*Id*. at 24-25, 64-65; Tassin Decl. ¶ 10.)  This was Fettig's first dismissal from Grand Trunk.  (Fettig Dep. at 24-28; Fettig Dep. Ex. 1.)  Manta had been dismissed from Grand Trunk once before, in the 1990's.  (Manta Dep. at 24-26; Manta Dep. Ex. 1.)

Following the dismissal, Fettig made extensive efforts to return to work, contacting the Union at least six times and management at least nine times, asking to be returned to service.  (Fettig Dep. at 41-44.)  Tassin did not want Fettig reinstated and he communicated his position to the Union as late as March 7, 2013. (Tassin Decl. ¶ 10.)  Tassin, however, did not have the authority to make reinstatement decisions at that time and his supervisor, Derrick Colasimone, decided to reinstate Fettig on a leniency basis in March 2013.  (Fettig Dep. at 28, 44-46; Fettig Dep. Exs. 1, 3; Tassin Dep. 1 at 66; Miller Dep. 1 at 93.)  The dismissal remained on Fettig's work record, however.  (Fettig Dep. at 31; Fettig Dep. Ex. 3.)

10

Tassin subsequently was promoted and became responsible for making reinstatement decisions.  (Tassin Decl. ¶¶ 2-3.)  He eventually agreed to reinstate Smith and then Manta on a leniency basis, removing Smith's termination from his work record on the condition of a last-chance agreement that provided that "any future incident . . . may result in disciplinary action, up to and including dismissal." (Pl. Dep. at 145-46; Pl. Dep. Ex. at 17; Manta Dep. at 28-29; Manta Dep. Ex. 4.) Smith was not paid for his time in dismissal status.  (Pl. Dep. at 145; Pl. Dep. Ex. 17; Tassin Dep. 2 at 19-20.)  Tassin indicated that he reinstated Smith, despite his lengthy disciplinary history, because he thought Smith had a good attitude and he wanted to give Smith one last chance.  (Tassin Dep. 1 at 65-66; Tassin Dep. Ex. 6; Pl. Dep. at 97; Pl. Dep. Ex. 10 at GTW 1254-55.)  Smith signed his reinstatement agreement on May 22, 2013, and returned to service on or before June 6, 2013. (Pl. Dep. at 145; Am. Compl. ¶ 18.)  Manta returned to service in August 2013. (Manta Dep. at 28-29; Manta Dep. Ex. 4.)

In the meantime, in or about March 2013, Smith had filed a charge of discrimination with the Michigan Department of Civil Rights and the EEOC.  (Pl. Dep. Ex. 9.)  In the Charge of Discrimination, Smith alleged that his termination as a result of the January 22, 2013 incident and the re-hiring of Fettig, and not him, constituted race discrimination and retaliation.  (*Id*.)  He also asserted that he learned on September 10, 2012 that he had received more efficiency testing than

11

his Caucasian co-workers.[2]  (*Id*.)  Grand Trunk investigated Smith's claims,

including interviewing witnesses and analyzing performance and other relevant

documents.  (Spears Decl. ¶ 8.)  Grand Trunk could not substantiate Smith's

allegations.  (*Id*. ¶ 9.)  On July 18, 2013, the EEOC dismissed Smith's charge,

finding no probable cause, and issued a right-to-sue letter.  (*Id*. ¶ 10; Compl. ¶ 4,

ECF No. 1.)  Smith then filed the pending lawsuit on October 10, 2013.  (Compl.,

ECF No. 1.)

Smith, in the interim, had been reinstated and returned to service on or

before June 6, 2013.  On July 5, 2014, he was involved in an incident while

working as a Utility Brakeman with Conductor Christopher Stevens (who is

Caucasian) in the Battle Creek, Michigan yard, "switching" railcars.  (Pl. Dep. at

313-16; Stevens Dep. at 25.)  "Switching" consists of separating railcars and

building new groups of cars for outgoing trains.  (Pl. Dep. at 304, 316.)  The

Conductor "kicks" a railcar (i.e. pulls the pin that holds cars together and

uncouples the railcar), and the railcar rolls down the track (i.e., "switching lead")

toward adjacent tracks. (Pl. Dep. at 295; Stevens Dep. at 27.)  The Utility

Brakeman or "switchman" is positioned further down the switching lead, where he

---

[2] This allegation is not included in the pending lawsuit.  In any event, the evidence
indicates that Smith in fact did not receive more efficiency testing than Caucasian
co-workers.  (Spears Decl. ¶¶ 9, 11.)

"lines" the switch for the adjacent track where the railcar is intended. (Pl. Dep. at 316; Stevens Dep. at 27.)

USOR 701 contains rules regarding the position of switches and states in part:

> Equipment must not enter the Foul Zone of an adjacent track until the hand-operated switch is properly lined. Employees must not line or foul the switch if a conflicting movement is approaching. Do not line the switch away from equipment that enters a track until the movement has passed the clearance point in the track.

(Pl. Dep. Ex. 71 at GTW 1834.) This rule ensures that a railcar is "in the clear" and is sufficiently into the track such that a railcar destined for an adjacent track will not collide with it. (Pl. Dep. at 304-06; Stevens Dep. at 32-34.) If a car unexpectedly stops before it is in the clear, the switchman must notify the Conductor and line the switch to avoid collision. (Pl. Dep. at 326; Stevens Dep. at 40.)

On July 5, 2014, Smith lined a switch to allow a grain hopper to enter Track 13 off the switching lead. (Pl. Dep. at 329-30, 379-80; Pl. Dep. Ex. 73, Ex. 75 at GTW 1809-10, 1824.) He did not ensure that the grain hopper was "in the clear" before lining the switch, which allowed a tank car loaded with a hazardous substance to travel toward adjacent Track 14. (Pl. Dep. at 329-334.) The grain hopper stopped before it was in the clear, and the tank car "cornered" it (meaning, collided into its side), causing more than $36,000 worth of damage. (*Id*. at 329-34,

355; Tassin Decl. ¶ 11.)  Smith and Stevens were removed from service pending an investigation as to their responsibility for the incident.  (Pl. Dep. Ex. 75 at 13.)

On July 11, 2014, Superintendent James Golombeski conducted an investigative hearing with respect to the cornering incident.  (Pl. Dep. at 380; Pl. Dep. Ex. 75.)  Smith contended that he followed standard practice by allegedly lining the switch after observing the grain hopper's rear trucks (i.e., rear wheels) pass the "frog" (where the rail splits into two, resembling an "x").  (Pl. Dep. at 308, 380; Pl. Dep. Ex. 75 at 1809-10.)  At his deposition in this matter, Smith acknowledged that while the grain hopper passed the frog, this was not the clearance point and that the clearance point varies based on the size of the cars entering adjacent tracks.  (Pl. Dep. at 334-36.)

Golombeski concluded that Smith violated company rules by failing to ensure the grain hopper was in the clear and to line the switches to avoid damage. (Golombeski Dep. at 18-19.)  Had Smith observed that the grain hopper had stopped before clearing the foul zone, he could have avoided lining the switch, thereby letting the tanker car enter Track 13 and couple with the grain car.  (Tassin Dep. 2 at 24-25; Hicks Dep. at 12.)  Golombeski concluded that Stevens had not violated any rules because he was pulling pins, 500 or more feet from Smith, and was not responsible for lining switches.  (*Id*. at 19; Tassin Dep. 2 at 13.)  Stevens released the cars only after he received the signal indicating that Smith had lined

14

the switches.  (Stevens Dep. at 28-30, 33-36, 41.)  Stevens relied on Smith's signal, as Smith was closer to the switching cars.  (*Id*.)

Tassin reviewed the investigative hearing transcript and agreed with Golombeski's conclusions.  (Tassin Dep. 2 at 7-10, 13-15; Pl. Dep. Ex. 78.)  After considering the severity of the incident, Smith's disciplinary record, and his last-chance agreement, Tassin decided to terminate Smith's employment.  (Tassin Dep. 2 at 18-20; Pl. Dep. Ex. 78.)  On September 16, 2014, Smith filed a First Amended Complaint in the pending action to add claims related to this latest incident.  (ECF No. 25.)

In his amended pleading, Smith asserts that his February 7, 2013 termination constituted race discrimination in violation of Title VII (Count I) and ELCRA (Count II).  Smith also claims in Count II that his July 6, 2011 termination constituted race discrimination.  Smith also asserts race discrimination claims based on his removal from service on July 5, 2014, and termination on July 21, 2014, under Title VII (Count III) and ELCRA (Count IV).  Finally, Smith alleges that the adverse actions Grand Trunk took against him on July 5, 2014 (his separation from service) and July 21, 2014 (his termination) violated Title VII, in that they were in retaliation for the filing of an EEOC charge and/or this lawsuit (Count V).  The parties subsequently stipulated to the dismissal of all claims brought by Smith related to incidents allegedly occurring in 2011.  (ECF No. 46.)

15

## III.   Applicable Law and Analysis

The same analysis applies to Smith's claims under Title VII and ELCRA. *See Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 n.4 (6th Cir. 2003).

### A.   Discrimination

Smith concedes that he has no direct evidence that he was treated adversely because of his race.  (Pl.'s Resp. Br. at Pg ID 1505, ECF No. 44.)  In such a case, courts apply the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), to analyze the plaintiff's claims. *Sutherland*, 344 F.3d at 614.  First, the plaintiff must establish a prima facie case of discrimination by showing that: he " '(1) . . . was a member of a protected class; (2) . . . suffered an adverse employment action; (3) . . . was qualified for the position; and (4) . . . was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees.' " *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)).

If the plaintiff satisfies his burden of proving a prima facie case of discrimination, the defendant must demonstrate a legitimate, non-discriminatory reason for the adverse employment action.  *Sutherland*, 344 F.3d at 614-15.  If the defendant presents such proof, the plaintiff, to prevail on the claim, must demonstrate that the proffered reason is a pretext for discrimination.  *Id.* at 615.

There are three ways the plaintiff can make this showing: demonstrating that the stated reason (1) has no basis in fact, (2) did not actually motivate the defendant's action, or (3) was insufficient to motivate the action. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), overruled on other grounds in *Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009)).

### i.    Smith's 2013 Termination and Reinstatement

Smith claims that Grand Trunk subjected him to race-based discrimination by terminating his employment on February 6, 2013 based on his and his fellow crew members' failure to perform, and ensure the performance of, the push-pull test to assess the effectiveness of the railcar handbrakes. Smith claims race discrimination based also on Grand Trunk's reinstatement of Fettig before Smith. Grand Trunk asserts that Smith cannot state a prima facie case of discrimination because he was treated exactly the same as similarly-situated non-protected employees. Specifically, Fettig and Manta (both Caucasian) also were terminated as a result of the incident and one of them, Manta, was reinstated *after* Smith.

Smith argues in response, with respect to the termination decision, that he did not engage in the same conduct as Fettig because Fettig was the crew member who disembarked the engine cab and stayed with the railcars. In essence, Smith is contending that Fettig alone was responsible for the failure to perform the push-pull test. Smith ignores, however, that Manta also was terminated. Manta, like

17

Smith, remained in the engine cab during the incident and Smith does not believe Manta was responsible for the incident.  (Pl. Dep. at 142.)  Further, Grand Trunk concluded that the entire crew was responsible for setting the brakes and performing the push-pull test.  The Sixth Circuit has often stated that " 'it is inappropriate for the judiciary to substitute its judgment for that of management.' " *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (quoting *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000)).

With respect to the timing of his reinstatement, Smith again focuses only on Fettig, who was reinstated before Smith.  He ignores that Manta was reinstated months *after* Smith.  Moreover, and contrary to Smith's assertions, he was not similarly situated to Fettig.  While they dealt with the same hearing officer and were punished by the same decision makers, the same individuals did not handle their reinstatement.  In response to Fettig's repeated efforts to return to work, Colasimone, notwithstanding Tassin's protests, decided to reinstate Fettig.  Tassin subsequently reinstated Smith.  Further, Smith had a more extensive disciplinary record than Fettig.  This was Fettig's first dismissal from Grand Trunk.

For these reasons, the Court concludes that Smith fails to demonstrate a prima face case to support his discrimination claims with respect to his termination and reinstatement in 2013.

18

### ii.   Smith's 2014 Termination[3]

Smith claims that his termination in July 2014 was discriminatory because Stevens, the Conductor at the time of the incident, who is Caucasian, was not disciplined.  Grand Trunk contends that Stevens and Smith are not similarly situated because Smith, alone, violated the rules which led to the cornering accident.  Smith responds that if all crew members are responsible for the safe operation of the trains under USOR 100 and 104-- as Grand Trunk contended when disciplining all crew members involved in the February 2013 incident-- Stevens also should have been disciplined.  (Pl.'s Resp. at Pg ID 117, ECF No. 25.)

Smith, however, was found to have violated USOR 600, 604, and 701 with respect to the July 2014 incident, not USOR 100 and 104.  (Pl. Dep. Ex. 78.) Unlike the incident in February 2013, Grand Trunk did not view all crew members

---

[3] In a footnote, Grand Trunk argues that Smith's Title VII claims relating to his 2014 termination must be dismissed because he has not obtained a right-to-sue letter from the EEOC and has thus failed to exhaust his administrative remedies with respect to these claims.  (Def.'s Br. in Supp. of Summ. J. at Pg ID 205 n.10, ECF No. 37); *see Parry v. Mohawk Motors of Michigan*, 236 F.3d 299, 309 (6th Cir. 2000) (stating that an employee has not exhausted his or her administrative remedies if he or she has not received a right-to-sue letter).  A right-to-sue letter is a necessary prerequisite to filing suit.  *Parry*, 236 F.3d at 309.  "However, the failure to obtain a right-to-sue letter is not a jurisdictional defect; rather the right-to-sue letter is a condition precedent."  *Id*. (citing *Rivers v. Barberton Bd. of Educ.*, 143 F.3d 1029, 1032 (6th Cir. 1998)).  As such, the requirement may be waived by the court or the parties.  *Id*.  The Court is waiving the requirement here for two reasons.  First, Grand Trunk relegates its exhaustion argument to a footnote. Second, the outcome of Grand Trunk's motion is the same whether or not the Court addresses the argument.

19

as responsible for the violations that occurred on July 5, 2014.[4]  (Golombeski Dep. at 18-19; Tassin Dep. 2 at 15.)  Smith was working as the switchman at the time of the incident and, as such, was responsible for ensuring the railcars entered the clearance point of the track before lining switches away from that track, to prevent cars from cornering cars in adjacent tracks.  (Pl. Dep. at 316; Pl. Dep. Ex. 75 at 41.)  Stevens, in comparison, was working as the Conductor, and was responsible for kicking or releasing the cars down the track.  (Pl. Dep.  at 315, 317; Golombeski Dep. at 19; Tassin Dep. 2 at 13-15.)

Smith does not offer any other evidence to suggest that he was treated differently than similarly situated non-protected co-workers.  Therefore, the Court concludes that Smith fails to demonstrate a prima facie case of discrimination with respect to his 2014 termination, as well.

### B.    Retaliation

Title VII prohibits retaliation against employees who exercise their statutorily-protected rights. 42 U.S.C. § 2000e-3(a).  The *McDonnell Douglas* burden-shifting framework governs claims of retaliation based on circumstantial

---

[4] In his response brief, Smith points out that when Stevens was asked during his deposition in this case whether he was at fault for the incident on July 5, he responded: "Well, I was part of the crew."  (Pl.'s Resp. at Pg ID 1512, ECF No. 44, citing Stevens Dep. at 48.)  And when asked whether he thought he should have been disciplined, Stevens responded: "I'm surprised I wasn't."  (*Id*.)  What Stevens thought, however, is not relevant.  He was not responsible for making disciplinary decisions within Grand Trunk.  Moreover, Stevens also testified that he did not think he violated any rules.  (*Id*.)

evidence. *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009). To establish a prima facie case of retaliation under Title VII, the plaintiff has the initial burden of establishing four elements: (1) the plaintiff engaged in protected activity; (2) the defendant knew about the plaintiff's exercise of this right; (3) the defendant took an employment action adverse to the plaintiff; and (4) the protected activity and the adverse employment action are "causally connected." *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001). With respect to the last element, the plaintiff must establish "but-for" causation which " 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.' " *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, -- U.S. --, 133 S. Ct. 2517, 2533 (2013)); *see also EEOC v. Ford Motor Co.*, 782 F.3d 753, 770 (6th Cir. 2015) (discussing the but-for causation requirement within the context of the plaintiff's prima facie case).

If the plaintiff establishes a prima facie case of retaliation, the defendant must articulate a non-retaliatory reason for its actions. *Spengler v. Worthington Cylinder*, 615 F.3d 481, 492 (6th Cir. 2010) (citations omitted). If the defendant satisfies its burden, the plaintiff, to succeed, must show that the " 'proffered reason was not the true reason for the employment decision.' " *Id.* (quoting *Tuttle v.*

21

*Metro. Gov't of Nashville*, 474 F.3d 307, 320 (6th Cir. 2007) (additional quotation marks and citations omitted)).

Grand Trunk argues that Smith cannot establish a prima facie case of retaliation because he cannot show "but-for" causation. Smith relies on temporal proximity, alone, to establish this element. (*See* Pl.'s Resp. Br. at Pg ID 1513-14, ECF No. 44.) The fact that the protected activity and adverse employment action are acutely near in time may serve as indirect evidence of retaliation, although the Sixth Circuit Court of Appeals has issued conflicting opinions with respect to whether temporal proximity alone may demonstrate but-for causation. *See, e.g., Benison v. Ross*, 765 F.3d 649, 661 (6th Cir. 2014) (indicating that "[u]nder some circumstances, close temporal proximity between protected conduct and an adverse action may be sufficient on its own to raise an inference of causation."); *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505-06 (6th Cir. 2014) ("[W]e have held that temporal proximity alone can be enough"); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (finding that temporal proximity of three months was "significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying [the plaintiff's] burden of demonstrating a prima facie case"); *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004) (finding temporal proximity of twenty-one days between the plaintiff's protected activity and termination "sufficient enough to constitute indirect evidence of a causal

22

connection so as to create an inference of retaliatory motive."); *but see, e.g.*, *Warf v. United States Dep't of Veterans Affairs*, 713 F.3d 874, 880 (6th Cir. 2013) (indicating that "[t]emporal proximity is not enough to prove a causal connection and must be considered in conjunction with other evidence" and citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 565-66 (6th Cir. 2000), where the court reconciled past decisions); *Tuttle*, 474 F.3d at 321 ("The law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim.").  Even assuming that temporal proximity may be enough for Smith to satisfy his burden of proof, he cannot rely on temporal proximity here because Grand Trunk's knowledge of his protected activity and his termination are not sufficiently close in time.

Smith filed his EEOC charge on April 12, 2013, and the instant lawsuit on October 10, 2013.  The cornering incident occurred nine months later on July 5, 2014, and Grand Trunk terminated Smith's employment as a result of the incident on July 21, 2014.  Golombeski was unaware of Smith's protected activity when, as the investigative hearing officer, he found that Smith had violated the rules. (Golombeski Decl. ¶ 3.)  Tassin, who made the decision to terminate Smith, was aware of Smith's claims of race discrimination and retaliation in late Spring 2013. (Tassin Decl. ¶ 9.)  Such a gap between when Tassin became aware of Smith's protected activity and the alleged retaliatory conduct is too attenuated to establish

23

retaliation.  *See, e.g., Miller v. City of Canton*, 319 F. App'x 411, 422 (6th Cir. 2009) (six months insufficient); *Nguyen*, 229 F.3d at 566-67 (indicating that the "cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months") (internal citations and quotation marks omitted).

Smith points to Tassin's receipt of a deposition notice on July 10, 2014 to establish temporal proximity.  The date Tassin learned that he was being deposed in this lawsuit is irrelevant, however, because he already was aware of the lawsuit. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (finding lack of temporal proximity even though adverse action occurred soon after the plaintiff received her right-to-sue letter because the defendant knew almost two years earlier about the protected action-- that being, the filing of the EEOC complaint); *Grey v. City of Oak Grove*, 396 F.3d 1031, 1035 (8th Cir. 2005) (indicating that the focus is on temporal proximity of termination and the plaintiff's *initial* complaint). Furthermore, the service of Tassin's deposition notice was not an activity taken by Smith and is not activity protected under Title VII.  *See* 42 U.S.C. § 2000e-3(a); *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 719-20 (6th Cir. 2008) (explaining that "Title VII forbids an employer from 'discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII] [the so-called 'opposition clause'], or because

24

[the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII] [the so-called 'participation clause']") (brackets in original) (quoting 42 U.S.C. § 2000e-3(a)).

For these reasons, the Court concludes that Smith fails to demonstrate a prima facie case of retaliation in violation of Title VII.  But even if he established his prima facie case, Grand Trunk demonstrates that it had a legitimate, non-retaliatory reason for terminating Smith's employment.  Smith fails to demonstrate that this reason was a pretext for retaliation.

## IV.    Conclusion

In summary, the Court concludes that Smith fails to demonstrate that his termination and reinstatement in 2013, or his termination in 2014, were the product of race-based discrimination in violation of Title VII or ELCRA.  He also fails to show that his termination in 2014 was retaliatory, in violation of Title VII.  The Court therefore is granting summary judgment to Grand Trunk and is dismissing Smith's lawsuit with prejudice.  Grand Trunk recently filed several motions in limine, which therefore are being denied as moot.

Accordingly,

**IT IS ORDERED**, that Defendant Grand Trunk Western Railroad Company's Motion for Summary Judgment is **GRANTED**;

25

**IT IS FURTHER ORDERED**, that Defendant Grand Trunk Western

Railroad Company's motions in limine (ECF Nos. 52-58) are **DENIED AS**

**MOOT**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: June 3, 2015

I hereby certify that a copy of the foregoing document was mailed to counsel of
record and/or pro se parties on this date, June 3, 2015, by electronic and/or U.S.
First Class mail.

s/ Richard Loury
Case Manager

26